UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ELLIOT KREMERMAN,

                 Plaintiff,

      v.

OPEN SOURCE STEEL, LLC, et al.,

                 Defendants.

CASE NO. C17-953-BAT

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court are the motions for summary judgment of Plaintiff Elliot Kremerman ("Kremerman") and Defendant/Counterclaimant Open Source Steel, LLC ("OSS"), pursuant to Fed. R. Civ. P. 56, on OSS's counterclaims for patent false marking in violation of 35 U.S.C. § 292, and unfair business practices in violation of the Lanham Act, 15 U.S.C. § 1125(a) ("Lanham Act"), and Washington's Consumer Protection Act, RCW Section 19.86.020 ("CPA"). Dkts. 113[1] and 115, respectively.[2]

The Court grants Plaintiff's motion, denies Defendant's motion, and dismisses Defendant's counterclaims with prejudice.

---

[1] Originally docketed at Dkt. 110, but refiled with documents under seal pursuant to Stipulated Protective Order (Dkt. 74).

[2] Based on prior dismissals, Plaintiff has no affirmative claims remaining and OSS's counter-claims 1-5 were rendered moot. *See* Dkts. 97, 103.

# BACKGROUND

## A.  Procedural Background

This case involves the alleged infringement of patented cannabis distillation equipment. Kremerman, who operates through a California-based company, Summit Industrial Supply, LLC, d/b/a Summit Research Tech ("Summit")[3], filed his original complaint against Defendants Open Source Steel, LLC ("OSS"), and its principals, Joshua Dellay and James Dellay (collectively "Defendants") in the Northern District of California on January 20, 2017. Kremerman claimed Defendants copied and marketed knock-off versions of his innovative patented distillation head products. He alleged (1) direct infringement of U.S. Design Patent Nos. D775,310 and D776, 238 ("the Patents") under 35 U.S.C. § 271(a); (2) induced infringement of the Patents under 35 U.S.C. § 271(b); (3) contributory infringement of the Patents under 35 U.S.C. § 271(c); (4) trade dress infringement under § 43(a) of the Lanham Act; (5) unfair business practices under California Business & Professional Code § 17200(a) ("UCL"); and (6) unjust enrichment. Dkt. 1. On June 9, 2017, the case was transferred to this Court. Dkts. 45-46.

On September 8, 2017, the Court dismissed Kremerman's induced infringement, contributory infringement, and unjust enrichment claims. Dkt. 76. On October 27, 2017, Defendants filed an Answer to the Complaint (Dkt. 82) and on March 27, 2018, filed a First Amended Answer asserting the counterclaims now at issue. Dkt. 93. On April 23, 2018, after Kremerman filed a Rule 12(b)(6) motion to dismiss (Dkt. 95), Defendants filed a Second

---

[3] There are "no artificial distinctions between Kremerman and Summit." Dkt. 116, Declaration of Rick Chang, Exh. 22 at 3. The Court assumes the acts of one are the acts of the other.

Amended Answer, Affirmative Defenses, and Counterclaims, further detailing their counterclaims and mooting Kremerman's motion to dismiss. Dkt. 97.

On May 24, 2018, Kremerman filed a motion to voluntarily dismiss his affirmative claims because "Defendants have discontinued sales, marketing, and distribution of the products infringing on [the] patented designs"[;] "the sales volume of the infringing products was very low"; "[his] damages claim thus would not be sufficiently large to justify pursuing his claims[;]" and he would pursue a "re-examination of the patents-in-suit based on claimed prior art." Dkt. 98 at 5-6. The parties agreed Kremerman's patent and trade dress infringement claims should be dismissed with prejudice as Kremerman had simultaneously submitted a terminal disclaimer to the United States Patent and Trademark Office ("USPTO") disclaiming the remaining term of the Patents as of May 18, 2018, which rendered his pending patent and trade dress claims moot, and eliminated any likelihood of future issues regarding the Patents and corresponding trade dress. Dkts. 98, 100-102. Defendants requested dismissal with prejudice of Kremerman's UCL claim. The Court dismissed the claim without prejudice as Defendants had not shown legal prejudice. Dkt. 103 at 2. On September 7, 2018, Kremerman sought leave to amend his complaint to assert an unfair business practices claim under Washington law. Dkt. 107. That motion was denied because of undue delay and inability to show good cause for the amendment. Dkt. 128.[4]

_____

[4] OSS contends the voluntary dismissal proves that Kremerman had no basis to bring such claims. The contention is without merit. Kremerman has never admitted to the falseness of his claims and OSS acknowledged it has no basis to dispute that Kremerman genuinely believed OSS counterfeited and copied his products. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 186:4-17; 188:8-17).

1    Remaining at issue are OSS's counterclaims for patent false marking and unfair business

2    practices under the Lanham Act and Washington's CPA. OSS contends Kremerman claimed his

3    distillation products were patented when they were not and that he falsely disparaged OSS and

4    its owners with the intent to dissuade customers and suppliers from doing business with OSS and

5    to put OSS out of business. Dkt. 115 at 6-7. In his motion for summary judgment and in

6    opposition to OSS's motion for summary judgment, Kremerman contends that OSS cannot show

7    the required injury or damages to support its claims and cannot show that any statements made

8    by him amounted to false marking or that they misled or deceived anyone. Dkts. 113 and 130.

9    **B.    Factual Background**

10   Kremerman is a California resident and Summit Industrial Supply is a California

11   company. Dkt. 112, Declaration of Elliot Kremerman, ¶ 1. Kremerman has designed, marketed

12   and distributed cannabis distillation products, including distillation heads, since 2015. *Id.* In

13   2015, Kremerman developed two novel designs for a short-path distillation head, SPD-1 (a

14   bent head product) and SPD-2 (a straight head product). *Id.* at ¶ 2. According to Kremerman, his

15   initial designs were different from anything else previously on the market because he specifically

16   designed the distillation heads for the cannabis market, *i.e.*, by changing the size and geometry of

17   the heads and joints used to attach the distillation heads to the distillation kit, utilizing quality

18   glass, and using designs that did not require a separate vacuum port. *Id.*

19   Kremerman hired custom glassware manufacturers to manufacture custom-made products

20   based on his designs and specifications. He first hired United Glass Technologies ("United

21   Glass") owned by Max Carraro, and later a company called Rocco Scientific operated by

22   Anthony Rocco. Kremerman began working with Max Carraro and United Glass in mid-2015,

and transitioned the manufacturing of his distillation head products to Rocco Scientific in 2016. Dkt. 112, Kremerman Decl., ¶ 3. Kremerman's initial SPD-1 and SPD-2 products were immediately successful once he began marketing them in 2015. *Id.* at ¶ 4.

In March 2016, Kremerman retained a New Jersey-based intellectual property lawyer, Michael Feigin, to obtain patent and trademark protection for his products and designs, which included registering the "SPD" trademark and filing patent applications for the SPD-1 and SPD-2 distillation heads. The initial patent applications were completed and filed by April 11, 2016. Patent D775310 (for SPD-1) and D776238 (for SPD-2) were issued on December 27, 2016 and January 10, 2016. *Id.*, ¶ 5.

In late 2015, OSS considered entering the market. OSS had no prior experience manufacturing, marketing, or distributing distillation products. Dkt. 114,[5] Morrissey Decl., Exh. 1 (OSS Depo. Tr. 62:5-63:3; 64:7-10.2). OSS first had discussions about distillation heads with a Chinese company, with which it later contracted to make its products sometime in late 2015. *Id.*, Exh. 1 (OSS Depo. Tr. 306:15-18.3). In February 2016, OSS contacted Kremerman's glassware supplier, United Glass, to obtain distillation heads. *Id.*, Exh. 1 (OSS Depo. Tr. 269:13-270:4; 273:17-24). OSS represented to Max Carraro of United Glass that it was seeking distillation heads because of its interest in using United Glass as a supplier of products for distribution. *Id.*, Exh. 1 (OSS Depo. Tr. 277:6-278:4; 278:8-18); Dkt. 111, Morrissey Decl., Exh. 5 (OSS01086). Carraro provided OSS with images and specifications for Kremerman's distillation head

---

[5] Mr. Morrissey's declaration was originally filed at Dkt. 111 with Exhibits 1 through 18, and re-filed at Dkt. 114 with Exhibits 1, 7, and 12 under seal.

products. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 274:12-16; 291:16-2; 327:12-15; 350:3-351:8); Dkt. 111, Morrissey Decl., Exh. 5 (OSS01087-88); *id.*, Exh. 6. Shortly thereafter, OSS sent the images and specifications provided by Carraro to the Chinese company. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. 311:25-312:7; 313:15-314:19; 344:9-19; 394:4-8); Dkt. 111, Morrissey Decl., Exhs. 6, 7. OSS then hired the Chinese company to manufacture straight and bent-head distillation products. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 329:15-22; 367:17-368:12; 383:7-11; 384:16-20).

In March 2016, OSS began marketing its distillation head products on social media, describing them as "American made" products that had been "reverse[] engineered" from the Summit products on the market. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. at 331:5-332:5; 384:8-20; 389:13-22). OSS also initially referred to its distillation head products in its marketing materials using Kremerman's "SPD" trademark. *Id.*, Exh. 1 (OSS Depo. Tr. 436:5-8); *see also* Dkt. 111, Morrissey Decl., Exh. 8 (advertisement for "Jacketed SPD Head"); Exh. 9 (email sent to distribution list offering "OSS SPD" distillation head).

In March 2016, Kremerman learned that OSS was marketing distillation heads that appeared to be very similar to his products. From social media posts made by OSS and its principal James Dellay, Kremerman learned that OSS claimed it had "just reverse engineered" Kremerman's products. Dkt. 112, Kremerman Decl., ¶ 6, Exh. 1 (EK0199). Kremerman also learned that OSS was marketing his distillation heads when he saw a post with an image of his distillation head on OSS's Instagram page. Max Carraro of United Glass testified that OSS told him Kremerman was a former employee of theirs and that OSS actually owned the rights in Kremerman's designs and Summit's products and Kremerman testified that Carraro shared this

information with him in March 2016. Dkt. 111, Morrissey Decl., Exh. 2 (Carraro Depo. Tr. at 376:10-378:5); Exh. 3 (Kremerman Depo. Tr. 217:16-218:3). OSS maintains that it made no mention of Kremerman or Summit in its communications with Carraro. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 275:21-25). Kremerman denies that he ever worked with OSS or either of the Dellay brothers, and never authorized OSS to have access to his products or designs or to act as a distributor of his products. Dkt. 112, Kremerman Decl., ¶ 7.

Kremerman was very concerned that the presence of competing versions of his product designs on the market would undermine the potential market for his own products. Dkt. 112, Kremerman Decl. ¶ 5. OSS's Chinese-made versions of the distillation heads had significantly lower manufacturing costs, and OSS was thus able to price its products substantially lower than Kremerman's prices. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 320:17-22; 354:14-24; 367:24-368:12); *compare id.*, Dkt. 111, Morrissey Decl., Exh. 10 at -1072 (distillation heads from United Glass at $250 per unit) with Exh. 7 (distillation heads from Chinese manufacturer (using specifications provided by United Glass), *see* Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 311:25-312:7; 313:15-23); *compare* Dkt. 111, Morrissey Decl., Exh. 11 (large distillation heads from United Glass at $315 per unit) with *id.*, Exh. 12 (distillation heads using specifications provided by United Glass from the Chinese company).

On April 22, 2016, Kremerman authorized his lawyer, Mr. Feigin, to send OSS a "cease and desist" letter that informed OSS of his intent to pursue litigation against OSS if it continued marketing distillation head products. Dkt. 112, Kremerman Decl., ¶ 9, Exhibit 2 (EK02467-EK02470. The letter was sent to OSS via certified mail and signed for by a representative of OSS (EK04088). *Id.*, Exhibit 3. Kremerman also posted the cease and desist letter on his Summit

Research Tech Facebook account on July 12, 2016. Dkt. 116, Chang Decl., Exh. 16. OSS never responded to the cease and desist letter. This lawsuit was filed in January 2017. Dkt. 112, Kremerman Decl., ¶ 9.

## C.    Motions to Strike

OSS lists various statements of fact ("SOF") it considers "not reasonably disputed." Dkt. 115 at 8-17. Kremerman "moves to strike the following exhibits and 'SOFs' that rely on them: Exhibits 4, 5, 5a, 13, 16, and 24; SOFs 2, 5, 16, 38, 40, 53." Dkt. 129 at 14. Kremerman also moved to strike, but failed to include in the foregoing summary, Exhibit 19 and SOF 61. *See id.* Kremerman also moves to strike the declaration of Joshua Dellay, presented in opposition to Kremerman's motion for summary judgment (Dkt. 132) because it purports to offer a new damages calculation not previously provided in discovery.


### 1.    Exhibits and Correlating SOFs[6]

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). "In a summary judgment motion, documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Fed.R.Civ.P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.' [citation omitted]. However, a proper foundation need not be established through personal knowledge but can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902." *Id*. at 773–74. "The burden to

---

[6] The term "SOF" is used for clarity in dealing with Kremerman's motions to strike only.

authenticate under Rule 901 is not high." *United States v. Recio*, 884 F.3d 230, 236 (4th Cir. 2018); *quoting United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014). "The district court must merely conclude that 'the jury could reasonably find that the evidence is authentic,' not that the jury necessarily would so find." *Id*.

To the extent an "SOF" created by OSS in its briefing merely describes the exhibit to which it refers (and if the exhibit is deemed admissible), the SOF need not be stricken. However, if an SOF incorporates legal argument, conclusions, and/or facts in disputes, it will not be considered by the Court.

> **SOF 2:** On March 10, 2016, Kremerman wrote on Summit Industrial's website: "We have combined the quality and efficiency unseen in typical short path distillation heads into the Licensed E-Vigoreux SPD-2 short path head."; "We have combined the quality and efficiency unseen in typical short path distillation heads into the Licensed E-Vigoreux SPD-1 short path head." Dkt. 116, Chang Decl., Exh. 4.

Plaintiff moves to strike SOF 2 and Exhibit 4 because it was not produced in discovery; counsel for OSS cannot personally attest to its authenticity; and Kremerman did not verify the images contained in Exhibit 4 at his deposition. Dkt. 129 at 7 (citing Dkt. 116, Chang Decl., Exh. 18, Kremerman Depo. Tr. 288 ("Q. … do you have any reason to believe that this … was not on your website? A. I don't know. I don't know if this was rewritten. I don't know anything.").

Exhibit 4 is a copy of Kremerman's webpage, which was entirely within his possession, custody, and control. Exhibit 4 was presented to Kremerman and his counsel for authentication during their depositions. Mr. Feigin testified that he submitted as exemplars, the images from his client's webpage to the USPTO in support of Kremerman's sworn patent applications, and that he reviewed the images before submitting them. Dkt. 136, Declaration of Duane Mathiowetz,

Exh. 3 (Feigin Depo. Tr. 79:8-80:6; 80:24-81:7; 81:22-82:1). Kremerman, who is the custodian of his company's documents, testified "if this was the image that was taken from my website during that time, it's probably correct." Dkt. 116, Chang Decl., Exh. 18 (Kremerman Depo. Tr. 288:17-23). Kremerman also confirmed that his patent attorney sent in the image (*id.* at Kremerman Depo. 288:11-13); and that he did not have a patent license at the time he made the statements in March 2016 (*id*. at Kremerman Depo. Tr. 289:7-18).

Kremerman also objects to Exhibit 4 on the grounds that it is inadmissible hearsay. However, when a statement is offered against an opposing party and the statement was made by the party, it is not hearsay. Fed. R. Evid. 801(d)(2). As previously noted, there are "no artificial distinctions between Kremerman and Summit" (*see* Dkt. 116, Chang Decl., Exh. 22) and therefore, the acts of one are considered the acts of the other. Even if it is considered hearsay, it qualifies under the hearsay exception as a record of regularly conducted business activity (*see* Fed.R. Evid. 803(6)), because it was posted and published on Summit's webpage and used as an exemplar in a sworn patent application. Based on the foregoing, the jury could reasonably find that the evidence is authentic and therefore, Plaintiff's motion to strike Exhibit 4 and SOF 2 is **denied**.

> **SOF 5:** On April 8, 2016, Kremerman wrote on his Facebook account that his patent agent had "worked up the sexiest images of our products for the patent….the images that are being applied to our granted patents are so f*cking sexy its amazing." Dkt. 116, Chang Decl., Exh. 5 at 25 ("true and correct copy of images from Elliott Kremerman's Facebook account under the name 'Jonathan von Braun.'").

Plaintiff moves to strike Exhibit 5 because it is unauthenticated and inadmissible in its entirety because it was not produced in discovery; Facebook records must be authenticated by

"certification by a Facebook records custodian;" and Kremerman did not "verify" the exhibit during his deposition or testify that he used this Facebook account "extensively for …business." Dkt. 129 at 8.

As Exhibit 5 was taken from Plaintiff's Facebook account, it was in his sole possession, custody, and control, before and during this litigation. OSS contends only Kremerman knew that this account was under the alias "Jonathan von Braun" as this name was not identified in Plaintiff's initial disclosures and counsel for OSS independently discovered the account on Facebook and put it before Kremerman during his deposition. Dkt. 135, Appendix A at 4-5. Kremerman testified that he recognized this Facebook account and identified the names it was held under before it was changed to "Jonathan von Braun," *i.e.*, "Jon Brown" and "Jon Brown Valentine. Kremerman changed the account to Jonathan von Braun when the account was banned for violating Facebook's posting policies. Dkt. 116, Chang Decl., Exh. 18 (Kremerman Depo. Tr. 391:13-392:7, 393:9-394:2, 426:6-10); *see also*, Exh. 5 (Facebook page of Jonathan von Braun at p. 12 ("spread the word yall, ill be on here for a while. elliot kremerman account got a ban.")

Kremerman never indicated this document was anything other than his own Facebook account and there is no evidence that someone else accessed his account. Dkt. 116, Chang Decl., Exh 18 (Kremerman Depo. Tr. 394:3-11). When asked if he had any reason to believe this was not a representation or copy of his Facebook account, Kremerman admitted "its from [his] original account." *Id.*, Exh 18 (Kremerman Depo. Tr. 393:5-18). Kremerman also testified that he used the account for his business, "[s]ome promotion stuff, sure." *Id.*, Exh. 18 (Kremerman Depo. Tr. 393:25-394:2).

Relying on *United States v. Recio*, 884 F.3d 230, 237 (4th Cir. 2018), Kremerman argues that OSS must present a certification from Facebook to properly authenticate this exhibit. However, the gist of *Recio* is not whether a jury could find that Kremerman did not author the posts in question, but rather whether the jury could reasonably find that he did. Here, there is sufficient evidence to tie Kremerman to the account. At all times, Kremerman acknowledged this was his Facebook account (Dkt. 116, Chang Decl., Exh. 18 (Kremerman Depo. Tr. 391:13-392:12; 426:6-10)), and he never disputed ownership of the account or authorship of the contents, albeit he disputes the audience and whether he used the account for business purposes.[7]

Based on the foregoing, there is sufficient evidence from the account and from Kremerman's testimony, for the jury to reasonably find that the evidence is authentic. Therefore, Plaintiff's motion to strike SOF 5 and Exhibit 5 is **denied**.

**SOF 16:** On October 14, 2016, Kremerman, again referring to his distillation head products, advertised and promoted on Summit's website that "THIS GLASSWARE IS PATENTED BY THE U.S. PATENT AND TRADEMARK OFFICES." Dkt. 116, Chang Decl., Exh. 13 at EK04723 (emphasis in original). Kremerman confirmed that this statement was on his website on or around this time. *Id.*, Chang Decl., Exh. 17 (Kremerman Depo. 303:1-302:6). Kremerman's website extended to both intrastate (Washington) and interstate commerce.

Kremerman moves to strike Exhibit 13 on the grounds it contains inadmissible hearsay. Dkt. 129 at 10. Exhibit 13 is a letter from an attorney for Julabo USA, Inc. to Elliot Kremerman

---

[7] In his declaration, Kremerman states he thought the account was suspended and no longer accessible, he had not accessed the account since 2016, it was a personal account, intended for an audience of less than 200 friends, and was "not a business account, although he sometimes referred to his business on the account." Dkt. 112, Kremerman Decl., ¶ ¶ 11-12.

at Summit Industrial Supply, LLC, regarding "Summit Research Disparagement of JULABO®

Trademark", which states, in pertinent part:

> Your website states that "known counterfeiters on the market whom [sic]
> unethically steal the work of others for resale and should be avoided at all costs
> are, Open Source, Lab Society, Hi-Trust, Julabo, Genius extraction ... "
>
> . . .
>
> In connection with Summit Research's Kurzweg Rundkolben glass set
> SPD-2 and E-Vigoreux SPD-1products, your website states "THIS
> GLASSWARE IS PATENTED BY THE US PATENT AND TRADEMARK
> OFFICES." (Emphasis in original.) Your website, in connection with your
> Summit Hochstrom Filter product that, also states that Summit's "patented filter
> plate technology is the heart of this system." Published on your Facebook page1 is
> a cease and desist letter sent to Open Source Steel, LLC, on behalf of Summit
> Industrial Supply, dated April 22, 2006. In that letter your counsel states,
> "Summit Industrial Supply has non-published patent applications which are
> expected to issue soon." This statement is directly opposed to the statements on
> your website claiming patent protection for the above products. A search of
> USPTO patent records shows no published applications or issued patents in your
> name individually or in the name of Summit Industrial Supply, LLC. Your false
> statements regarding possession of U.S. patents are likely to dissuade others from
> purchasing products from other companies. Alone or in conjunction with your
> express, derogatory statements, referenced above, regarding the nature of Julabo's
> products, these false statements regarding patent protection are likely to harm
> Julabo.

Dkt. 116, Chang Decl., Exhibit 13 at 2-3. When asked about the letter and statements quoted in

the letter, Kremerman confirmed that he received the letter and posted the statements on his

website. Dkt. 116, Chang Decl., Exh. 18 (Kremerman Depo. Tr. 300:2-9; 301:3-23; and 303:24-

304:6). The evidence reflects that Kremerman received this letter from Julabo counsel in the

regular course of business, and that he verified the contents during his deposition. Thus, the jury

could reasonably find that the evidence is authentic and Kremerman's motion to strike Exhibit 13

is **denied**. Whether Kremerman "advertised and promoted" or the posting extended to intrastate

or interstate commerce are factual disputes.

**SOF 38:**  Along with posting the cease and desist letter, Kremerman wrote on Summit's webpage, "…buyers beware, this is counterfeit glass and low quality….we have images of their glass imploding on customers as well as heads in our hands that are known not to work." Dkt. 116, Chang Decl., Exh. 16.

Kremerman moves to strike Exh. 16 "which purports to be a screen shot from Plaintiff's Facebook account, but it has not been properly authenticated, is therefore inadmissible, and should be stricken from the record." Dkt. 129 at 12.

In his deposition, Kremerman confirmed that he posted the cease and desist letter on his Facebook account. Dkt. 116, Chang Decl., Exh. 18 (Kremerman Depo. Tr. 305:18-25; 306:1-16). Kremerman was shown and questioned about this exhibit at his deposition on August 30, 2018. At that time he did not deny this Facebook account belonged to him nor has he produced any evidence to contradict it in any way. Based on Kremerman's acknowledgements, the jury could reasonably find that Exhibit 16 is authentic and therefore, Kremerman's motion to strike SOF 38 and Exhibit 16 is **denied**.

**SOF 40:**  These disparagements were publicly posted even though Kremerman had no evidence to support his claims. Chang Decl., Exh. 18 (Kremerman Depo. 306:19-308:5).

Plaintiff argues that SOF 40 should be stricken because Defendant has provided no evidence that Exh. 16 was "publicly posted." Plaintiff also argues that Defendant's claim that Plaintiff had "no evidence" to support his claims is belied by the fact that those claims survived a motion to dismiss in this Court. Dkt. 129 at 12.

Exhibit 16 is a publicly available Facebook account that belongs to Kremerman, who is doing business as Summit Research Tech. The Facebook posts were copied from the publicly

available Facebook account and at the time counsel submitted his declaration, Kremerman's

Facebook accounts could be publicly viewed at the following urls:

> http://www.facebook.com/cold6dead6hads6
> http://www.facebook.com/SummitResearchTech/
> http://www.facebook.com/SummitResearchTech/

Dkt. 116, Chang Decl. ¶ 19. Therefore, Exhibit 16 was "publicly posted." *See*, *e.g.*, *Certainteed Corp. v. Seattle Roof Brokers*, 2010 WL 2640083, *5 (W.D. Wash.) ("The internet, by its nature, is accessible by an interstate audience.")

Kremerman's defense that his claim survived a motion to dismiss is not relevant to whether Kremerman was publishing false statements about his patents in July 2016. However, the Court views counsel's comment "even though Kremerman had no evidence to support his claims" as legal argument and/or facts in dispute.

> **SOF 53:** Although Kremerman agreed to take down the reference on his website to Julabo following Julabo's cease and desist demand (*see* Dkt. 116 Chang Decl., Exh. 23), he continued his public disparagement of OSS, leaving on his website the statement in SOF 52 as of November 14, 2016. Chang Decl., Exh. 24.

Kremerman moves to strike SOF 53 and Exhibit 24, a letter from an attorney for Genius Extraction Technologies, Inc. to Kremerman's attorney on the grounds that the statements contained in Exhibit 24 are unauthenticated and inadmissible hearsay. Dkt. 129 at 13.

The attorney for Genius Extraction is the same attorney representing Jubalo, who wrote the October 14, 2016 letter identified as Exhibit 13. In the November 14, 2016 letter identified as Exhibit 24, the attorney requests immediate removal of the statements from Summit's website relating to Genius Extraction. Dkt. 116, Exhibit 24.

At his deposition, Kremerman confirmed that he saw this letter, the letter was addressed to his counsel, and that it was received in the ordinary course of business. Kremerman also confirmed that after he received Exhibit 13, he removed the reference to Jubalo from his website, but left the reference to Genius and the other companies. Kremerman did not dispute that as of November 14, 2016, the statements at issue were on his website and that he put them there. Dkt. 116, Chang Exh. 18 (Kremerman Depo. Tr. 315:17-316:13; 301:4-23).

Based on the foregoing, the jury could reasonably conclude that Exhibit 24 is authentic and therefore, Kremerman's motion to strike Exhibit 24 is **denied**. However, the Court views OSS's statement that "Kremerman continued his public disparagement of OSS" as a legal conclusion and/or fact in dispute.

> **SOF 61**: Kremerman's false statements impacted the belief of his own supplier Max Carraro who in turn spread such false information to others. Dkt. 116, Chang Decl., Exh. 19.

Plaintiff contends that the email exchange between United Glass and "Raft" in Exh. 19 is inadmissible, unauthenticated hearsay and should be stricken from the record. Dkt. 129 at 14.

Exhibit 19, marked "EK01272," is a document produced by Kremerman in discovery. The document is an email exchange between Max Carraro of United Glass Technologies, Inc. and a person named Raft at kingraft@gmail.com requesting recreation of "a jacketed short path distillation head with virgreux," specifically referencing a unit advertised on OSS's website. *Id.* at EK01272-1273. Carraro responded that United Glass would not be able to reproduce the unit "like the one you have shown in the OSS link" because "[t]hat unit has been trademarked and patented by one of our customers who has selling & distribution rights to it." *Id.* at EK01273. On

December 6, 2016, Max Carraro sent an email to "jbsholistics@gmailcom" stating: "FYI, this was our reply to his email. 100% full disclosure, Elliot." *Id.* at EK01272.

During his deposition, Kremerman was presented with a copy of Exhibit 19 and he identified it as an email between himself and Max Carraro. Kremerman testified he told Carraro that he had patents when in fact, the patents had not issued, because he felt he had to "protect himself from Max" and, Kremerman did not correct Carraro's mistaken belief that the patents had issued. Dkt. 116, Chang Exh. 18 (Kremerman Depo. Tr. 283:13-284:25).

OSS proffers Exhibit 19 to demonstrate the direct and adverse impact Kremerman's false statements made on the recipient and how the false statements were spread in the marketplace. In his deposition, Mr. Carraro testified that, although he did not remember this specific email, he was "stating what Elliot told us, that he had trademark and patents on it." Dkt. 136, Declaration of Duane Mathiowetz, Exh. 4 (Carraro Depo. Tr. 284:2-285:11).

Based on the deposition testimony of Kremerman and Carraro, the jury could reasonably conclude that Exhibit 19 is authentic. Moreover, because the email exchange is offered to demonstrate the effects of Kremerman's statements on other retailers and consumers, it is not hearsay as it is not an "out-of-court statement offered to prove the truth of matter asserted." Therefore, Kremerman's motion to strike Exhibit 19 is **denied**. OSS's characterization of the statements contained in the exhibit and the effect of those statements on others, are considered legal argument and/or disputed facts.

## 2. Dellay Declaration – Dkt. 132

Rule 26 of the Federal Rules of Civil Procedure requires that parties "must, without awaiting a discovery request, provide to the other parties ... a copy—or a description by category

and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses ....” Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added). Rule 37 authorizes a court to impose sanctions “[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e) ….” Fed. R. Civ. P. 37(c). The party will not be “allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.” *Id*. The party facing sanctions has the burden of establishing its failure was harmless. *Yeti by Molly Ltd.*, 259 F.3d at 1106, 1107 (“Thus, even though [ ] never violated an explicit court order to produce the [] report and even absent a showing in the record of bad faith or willfulness, exclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a).”).

In response to Kremerman’s motion for summary judgment, Joshua Dellay provided a declaration setting out “precise calculations based on spreadsheets” to support the “general loss” to which he testified in his deposition on August 28, 2018. Dkt. 132 (Exhibits A through D). The exhibits include a financial spreadsheet showing specific quantities and prices of PolyScience chillers OSS purchased from Across International; PolyScience’s 2016 Price List indicating distributor pricing OSS “would have received from PolyScience;” emails between OSS and PolyScience confirming OSS would have received the approved distributor pricing; and a spreadsheet showing quantities and prices of non-PolyScience chillers OSS could have purchased from PolyScience (58 chillers purchased from Thermo Fisher for $116,565.20, which would have cost $99,612.00 from PolyScience). *Id.* at 1-2.

The deadlines for discovery and dispositive motions have long passed. During discovery, Kremerman asked OSS to identify the evidence supporting its claims of injury. Dkt. 111, Morrissey Decl., Exh. 4 (citing responses served by OSS on April 27, 2018). OSS responded that it suffered "loss of reputation, competitive injury, and lost sales," but produced no documents in support. Before Joshua Delay, as OSS's corporate representative, was deposed on August 28, 2018, counsel for Kremerman asked OSS counsel Rick Chang to provide any additional evidence OSS intended to rely on, but received no response. *Id.*, Morrissey Decl., ¶ 15.

The spreadsheets and figures extrapolated by Mr. Dellay were first provided on October 9, 2019, after his deposition was taken, discovery had closed, and the parties filed their summary judgment motions. Thus, Kremerman was denied the opportunity to depose OSS on this evidence.

The Court finds OSS committed a discovery violation by failing to provide "all documents" it "may use to support [its] … defenses…. *See* Fed. R. Civ. P. 26(a)(1)(A)(ii). In his motion for summary judgment, Kremerman argued that OSS had failed to provide any evidence of lost profits, sales, reputation or goodwill, or the ability to freely market or price products. Now, having pulled together spreadsheets and by extrapolating the cost of materials purchased from a supplier other than PolyScience, OSS claims it can now prove that it had to pay more for materials and therefore, suffered a loss. The Court notes that even with this evidence, OSS has not shown that the higher purchasing costs actually resulted in fewer sales or lower profits. Nevertheless, the issue now is whether OSS should be allowed to present this evidence at all at this stage in the litigation.

1    As a party and witness, Joshua Dellay can testify to matters within his personal

2    knowledge, thereby satisfying the requirements of Fed. R. Civ. P. 56(c) (declarations containing

3    factual averments made with personal knowledge are sufficient to support a motion for summary

4    judgment, and supporting documentation is not necessary). *See United States v. Two Tracts of*

5    *Land*, 5 F.3d 1360, 1362 (9th Cir. 1993); *see also* Fed. R. Civ. P. 56(c)(4). However, OSS is not

6    relieved of the duty imposed by Rule 26 to disclose "all documents" it "may use to support [its]

7    claims or defenses," even at the summary judgment stage. *See* Fed. R. Civ. P. 26(a)(1)(A)(ii).

8    Kremerman should have been given the opportunity to review these documents and to depose

9    Dellay on his methodology and calculations.

10   Because OSS failed to timely disclose the contents of Dellay's declaration and supporting

11   exhibits, OSS is precluded from relying on this information—including information within

12   Dellay's personal knowledge that relates to these undisclosed documents—in OSS's motion for

13   summary judgment or in opposition to Kremerman's motion for summary judgment. *See*, *e.g.*,

14   Rule 37(c) (allowing the court to preclude the use of this evidence or information in this case at

15   all). Accordingly, Kremerman's motion to strike the declaration and supporting exhibits (Dkt.

16   132 (Exhibits A through D)) is **granted**; this evidence has not been considered by the Court in

17   determining the pending summary judgment motions.

18                              **SUMMARY JUDGMENT STANDARD**

19   Summary judgment is proper only if the pleadings, the discovery and disclosure materials

20   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

21   movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

22   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

23   ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY
     JUDGMENT AND DENYING DEFENDANT'S MOTION FOR
     SUMMARY JUDGMENT - 20

showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e).

Where the moving party makes out a prima facie case showing it is entitled to judgment as a matter of law, summary judgment will be granted unless the opposing party offers some competent evidence that there is a genuine dispute as to a material fact. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Once the moving party meets its initial burden, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *accord Matsushita Elec.*, 475 U.S. at 586. Further, "[o]nly disputes over facts that might affect the outcome of the suit ... will properly preclude the entry of summary judgment [and] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

**A.    Patent False Marking – 35 U.S.C. § 292**

Title 35, section 292(a) prohibits in part "mark[ing] upon, or affix[ing] to, or us[ing] in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public." 35 U.S.C. 292(a).

Section 292(b) provides a private right of action of enforcement to any "person who has suffered a competitive injury as a result of a violation of this section." *Id.*, § 292(b). A private party will be successful in a civil action of false patent marking if the claimant can prove that the defendant (1) falsely marked an article with the word 'patent' or similar; (2) with the intent to deceive the public; and (3) which resulted in the claimant suffering a competitive injury. *Id.* Knowledge that the marking was false creates a rebuttable presumption of intent to deceive the public. *Pequignot v. Solo Cup Co.*, 608 F.3d 1356, 1362–63 (Fed.Cir.2010). The presumption can be rebutted by a showing of good faith. *Id*. at 1364.

### 1. False Marking

OSS's counterclaim for false patent marking is based on statements made by Kremerman (in company emails and personal and company webpages) that his short path distillation devices (identified as SPD-1 and SPD-2), were patented before the patents for these devices had issued and that he was in litigation with OSS when he had not yet filed suit. As previously noted, the patent applications were filed in April 2016 and the patents issued on December 27, 2016 (for the '310 patent) and January 10, 2017 (for the '238 patent). Kremerman served his cease and desist letter on April 22, 2016 and filed this lawsuit in January 2017.

The statements at issue occurred between March and October 2016, on Kremerman's webpages or in emails to suppliers and potential customers that: his distillation heads were licensed (Dkt. 116, Chang Decl., Exh. 4 at pp. 9-11 (Summit webpage); he had two patents on his short path distillation heads (*id.,* Exh. 6) (email to Mesa Organics, potential customer in Colorado); his attorney was in the process of serving [OSS] with patent numbers (*id.*, Exh. 26) (email to supplier United Glass); his patent agent had worked up images for "our products for the

patent" and "images that are being applied to our granted patents" (*id.*, Exh. 5) (Facebook); "we carry patents, trademarks, and known benchmarks on the performance of our gear." (*id.*, Exh. 7) (email to Tardif, potential customer in Maine); "I have 2 patents on distillation, and there is a reason why everyone tries to copy me!... Oh and we are involved in a federal lawsuit for counterfeiting because of them." (*id.*, Exh. 8) (email to potential customer); "I offer a genuine spd-2 patented head." (*id.*, Exh. 9) (email to Ruggles, potential customer in Hawaii); OSS is "straight up counterfeiting my products as I patent and release them." (*id.*, Exh. 10) (email to distributor, PolyScience); "I was adamant that I was in a suite [sic, lawsuit] with some crooks who stole images off my website." (*id.*, Exh. 10; *see also*, Exh. 18 (Kremerman Depo. Tr. 258:18-20 (he told PolyScience he was in litigation with OSS)); "not to mention the class action suit building from other people they owe money to." (*id.*, Exh. 11 (email to supplier United Glass); *see also*, Exh. 18 (Kremerman Depo. Tr. 234:14-25 (stating "it's an inflated comment" and "that was misspoken")); his distillation head is "under patent protection under the USPTO" (*id.*, Exh. 11); "We are waiting for them to continue to ignore his filing in federal court so either the fines build up enough to put them out of business or the delay [sic, Dellay] brother will get jail time for contempt of court;" (*id.*, Exh. 11); "I just released my third patent two weeks ago….And my fourth patent is under final review by the USPTO." (*id.*, Exh. 11 at EK01157); "theres [sic] a reason why in the cannabis industry I'm nearly the only one with patents, and I have 3 of them." (*id.*, Exh. 28) (email to potential client); "I have 4 of my own patents, and [I] have already won cases with my counterfeiters," and "fyi [I] actually do own patents and [I] know the legal way to get them and protect them." (*id.*, Exh. 12) (email to third party accusing Kremerman of infringement); "[B]ecause of my lawsuit I am no longer dealing with any

company that does business with oss, or any of my knock off competitors…. My patents are solid and because of this we are allowing those companies to build up punitive damages through the court system and case files/evidence." (*id.*, Exh. 27) (email to supplier United Glass); "you [Max Carraro] gave away my proprietary technology and patented hardware to a lying thieving low rent hack of a company." (*id.*, Exh. 27); and "THIS GLASSWARE IS PATENTED BY THE U.S. PATENT AND TRADEMARK OFFICE." (*id.*, Exh. 13 at EK04723 (emphasis in original) (Summit website). Kremerman confirmed that this statement was on his website on or around this time. *Id.*, Chang Decl., Exh. 17 (Kremerman Depo. Tr. 303:1-302:6).

The statements at issue were written by Kremerman from Summit Industrial's email and posted on Summit Industrial's webpage or were sent from his "Jon Brown [jbsholistics@ gmail.com]" email and/or posted on his "Jonathan von Braun" Facebook page. Kremerman conducted business under Summit, Summit Research, Summit Research Tech, and Summit Industrial and frequently used Facebook under various names and accounts (i.e., Summit Research, Summit Industrial, "cold6dead6heads6", Elliot Kremerman, Jon Brown Valentine, Jonathan Von Braun, and John Brown) to promote his products and as a way to communicate with the buying public and others in the industry. Dkt. 133, Mathiowetz Decl., Exh. 2 (40:25-41:4, 41:17-19, 42:8-12, 16-19, 44:9-25, 115:8-11, 118:20-24, 119:14-20; 305:18-21, 393:19-394:2). Although Kremerman maintains that "Jonathan Von Braun" was a personal account, intended for an audience of less than 200 friends and "not a business account," Dkt. 112, Kremerman Decl., ¶ ¶ 11-12, there is evidence he promoted his products on the account. *See*, *e.g.*, Dkt. 116, Chang Decl., Exhibit 5 at p. 21: "New product drop, game changer heading out the shop this week. Everyone interested get at us mid to end this week for the powder and we

will get u handled and shipped. All premium packaging and clean internal bagging. Amazing work is going into this product."

"To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139) (9th Cir. 1997). The statement at issue must be more than mere "puffery," *id.* at 1145, it must be "clearly one of fact, able to be proven true or false." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732 (9th Cir.1999).

The Court finds that Kremerman's statements specifically representing that he had patents on the distillation heads even though no patents issued until late December 2016, are clearly false and that a reasonable juror could not find otherwise. These statements are not mere puffery; for example, stating, "THIS GLASSWARE IS PATENTED" is something that could easily have been proven false and is one that customers reading Summit Industrial's webpage would rely upon due to Kremerman's presence in the industry.

### 2.     Intent to Deceive

The intent to deceive element is met "when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true." *Clontech Labs.*, 406 F.3d at 1352. "[T]he combination of a false statement and knowledge that the statement was false creates a rebuttable presumption of intent to deceive the public." *Pequignot*, 608 F.3d at 1362–63. The accused party may not simply assert that it did not intend to deceive because such a statement, "standing alone, 'is worthless as proof of no intent to deceive where there is knowledge of falsehood.'" *Forest Group, Inc. v. Bon*

*Tool Co.*, 590 F.3d 1295, 1300 (Fed.Cir.2009); *see also Clontech Labs. Inc.*, 406 F.3d at 1535 n.2 ("inference of intent to deceive cannot be defeated with blind assertions of good faith where the patentee has knowledge of mismarking.").

Kremerman testified that he used the word "patented" on his website for a period of time, but corrected his website when he was "alerted to it by his attorneys" and he came to understand he had "mistakenly used the word 'patented' rather than 'patent pending.'" Dkt. 129 at 22 (citing Exh. 3, Kremerman Depo. Tr. 454:10-22). He also testified that he "did not understand the process…. I believed that when your name is put on an application the patent is yours. I did not understand all of the other items required for patents until later down the line." *Id.* at 8 (citing Kremerman Depo. Tr. 359:12-16). Max Carraro of United Glass testified that Kremerman accurately informed him of the status of his patent applications and even though Kremerman referred to his products as "patented" in certain communications, Carraro did not believe Kremerman ever intended to mislead him. *Id.*, Morrissey Decl., Ex. 2 (Carraro Depo. Tr. 392:16-24; 393:10-20; *see also* Ex. 1 (Kremerman Depo. Tr. 188:8-17). The cease and desist letter sent in April 2016 and later posted on Kremerman's webpage, specifically stated that Kremerman's patents applications were filed and patents were pending. *Id.*, Morrissey Decl., Exh. 2. Kremerman also testified that he did not understand the lawsuit process and was "under the assumption that once you begin the process of suing someone, it is the same thing whether or not you have filed in federal court." Dkt. 116, Chang Decl. Exh. 18, Kremerman Depo. Tr. 261:14-19.

Kremerman's testimony however, shows that when he made the statements at issue, he knew he did not have issued patents. Dkt. 116, Chang Decl., Exh. 18 (Kremerman Depo. Tr.

82:5-7, 13-21 (he understood he only had an application as of April 22, 2016); 349:5-12 (he "overstated the subject matter" when he said he had patented heads); 197:10-25, 198:13-22 (he knew patent was still in application form when he made statement); 261:1-19 (he "overstated" when he claimed to be in a lawsuit and to own patents when he did not). And, even if Kremerman failed to appreciate the difference between pending patents and granted patents, he claimed he had "granted patents" before he had filed any patent application. *See, e.g.*, Dkt. 116, Chang Decl., Exh. 5 at 25. Whether he understood the difference between preparing for a lawsuit and actually being in a lawsuit does not explain his statement on October 9, 2016 "I have 4 of my own patents, and I have already won cases with my counterfeiters," at a time when no lawsuits had been filed and nothing had been won. *Id.*, Exh. 12. Moreover, as of October 9, 2016, he did not even have four pending patent applications, let alone "4 of [his] own patents." Other evidence belies Kremerman's claim that he merely "mistakenly implied to certain individuals" that the patents had issued. For example, on August 23, 2016, Kremerman wrote that "I just *released* my third patent two weeks ago. And my fourth patent is *under final review*." Dkt. 116, Chang Decl., Exh. 11 (emphasis added). Thus, Kremerman had sufficient knowledge to distinguish between a patent that was "just released" and one that is "under final review." This cannot logically be explained away by claiming a lack of sophistication regarding the patent process. *See, also*, Dkt. 133, Mathiowetz Decl., Exh. 2 (Kremerman Depo. Tr. 234:13-25, 262:8-263:20, 264:1-266:17, 269:17-21, 279:7-20, 361:1-362:12, 362:21-363:6 (he inflated information because he was upset; he "might have overspoken or inflated that topic" and "may not have had proof at the time"; he made up his claim that "[w]e filed a motion for a audit;" he misspoke when

he claimed he had patents before he even filed for them because he "was scared of [his]

intellectual property and [his] business being damaged by anyone and everyone").

The import of Kremerman's statements speak for themselves and demonstrate the intent

element of § 292(a). Kremerman publicly stated on his Facebook account on April 8, 2016 that

he already had "granted patents." Dkt. 116, Chang Decl., Exh. 5. As he had not by then even

submitted his applications for the patents, he would have known the literal falsehood of his

statements. What is less clear, however, is whether Kremerman "used" the statements at issue "in

advertising."

### 3. "Uses in Advertising"

Section 292 applies only to "advertising;" it does not encompass "promotion." Thus, "the

expression 'uses in advertising' cannot refer to any and all documents by which the word

'patent' is brought to the attention of the public; it can only refer to use of the word 'patent' in

publications which are designed to promote the allegedly unpatented product, namely,

advertisements." *Chamillia, LLC v. Pandora Jewelry, LLC,* 2007 WL 2781246 at * 10 (S.D.N.Y.

Sept. 24, 2007) (citing *Accent Designs, Inc. v. Jan Jewelry Designs, Inc.*, 827 F.Supp. 957, 968-

69 (S.D.N.Y.1993) (finding legend on defendant's invoices to be "used in advertising" because

they "serve the function of advertising by targeting a specific market, trade, or class of

customers"). "Advertising" is defined as "the action of calling something ... to the attention of

the public esp[ecially] by means of printed or broadcast paid announcements." *See Oakley, Inc.

v. Bugaboos Eyewear Corp.*, 757 F. Supp. 2d 1050, 1056-57 (S.D. Cal. Dec. 15, 2010).

Most of the statements at issue were made by Kremerman in emails in one-on-one

conversations and although some were made to individuals seeking to purchase products from

him, there is no evidence that they were designed to promote Kremerman's products to the public and certainly cannot be classified as "paid announcements." OSS concedes as much. *See* Dkt. 135 at 15 ("whether they constitute 'advertising' under the statute or not, they at minimum demonstrate Kremerman's intent to deceive.")

However, it can hardly be disputed that companies (Kremerman's included) use their websites to serve the function of advertising by targeting a specific market, trade, or class of customers seeking products in that marketplace. The Court concludes OSS has raised a question of material fact as to whether statements made by Kremerman on Summit's website or the Jonathan von Braun Facebook page meet the definition of "advertising," (*i.e.*, whether the statements at issue would have been primarily seen and relied upon by consumers or purchasers of Kremerman's or OSS's products). In that regard, the false marking evidence produced by OSS includes the March 10, 2016 posting that the distillation heads were licensed; the April 8, 2016 posting that Kremerman's patent agent had worked up sexy images for his patents; the July 12, 2016 posting of cease and desist letter (referring to pending patents); and the October 14, 2016 posting that "this glassware is patented." (As previously noted, Kremerman promptly corrected his website when the error was brought to his attention and there is no evidence that he posted any similar statements after 2016.) OSS also argues that Kremerman's email to PolyScience constitutes an advertisement "as the relevant audience of chiller retailers was very small,…" However, OSS offers no authority to support such a broad interpretation of "advertising" under § 292.

Even assuming a rational jury could find that these isolated statements constitute "advertising" under Section 292, however, the Court finds that summary judgment in favor of

Kremerman on OSS's false patent marking claim is warranted because OSS fails to raise a material issue of fact as to whether it suffered a competitive injury and this failure is fatal to its false marking claim.

### 4.     Competitive Injury

A claim for false marking requires that the claimant suffer a "competitive injury." 35 U.S.C. § 292(a). To show "competitive injury," a claimant must prove "actual competitive harm." *See Ira Green, Inc. v. J.L. Darling, Corp.*, No. 3:11-CV-05796-RJB, 2012 WL 4793005, at *10 (W.D. Wash. Oct. 9, 2012) ("It is Plaintiff's burden to come forward with evidence that Defendant's false marking was actually the cause of its lost sales. Causation and proof of lost sales, loss of reputation or goodwill, or inability to freely market or price products are required to survive summary judgment." (internal citations omitted)); *Server Tech., Inc. v. American Power Conversion Corp.*, 2013 WL 4506135, *2-*3 (D. Nev. 2013) (dismissing false marking claim where plaintiff did not prove "any sales actually lost" caused by false marking); *see also RB Rubber Products, Inc. v. ECORE Intern., Inc.*, No. 3:11-cv-319-AC, 2013 WL 3432081, *3-*5 (D. Or. Jul. 8, 2013) ("Accordingly, RB Rubber must allege an actual competitive injury arising from ECORE's false marking").

OSS claims that Kremerman's false marking caused "lost sales, lost opportunities, and harm to reputation." However, OSS provides no evidence of lost sales nor any reasonable basis for a jury to find that *because of* the statements at issue, OSS was damaged in an appreciable way. Instead, OSS argues that the Court may impose a general presumption of a competitive injury because OSS and Kremerman are direct competitors. However, OSS is not entitled to that presumption because it has not first presented evidence that anything Kremerman said "had a

tendency to mislead consumers" and has not presented facts of loss of sales, goodwill or ability to market that was *caused by* the false marking. "This causation is a necessary element of … 35 U.S.C. § 292." *Ira Green,* 2012 WL 4793005 at *10.

With regard to "loss of reputation," OSS claims only that "fielding inquiries from customers regarding the dispute with Kremerman has become a regular, and unfortunate, part of OSS's business." Dkt. 133, Mathiowetz Decl., Exh. 1 (Dellay Depo. Tr. 143:8-144:21, 148:17-149:8) (emphasis added) ("I had lots of customers *at the time* who were saying that Elliot was talking trash about our business, disparaging us, and also saying that he had patents on products"). A party claiming "loss of goodwill" must offer evidence of (1) the original value of its goodwill and (2) the scope and depth of the defendant's harm to the plaintiff's reputation. *See*, *e.g.*, *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012). The value of goodwill can be established, for example, by considering "a plaintiff's expenditures in building its reputation in order to estimate the harm to its reputation after a defendant's bad acts." *Id*.

Here, there is no evidence that fielding telephone calls from unknown customers *at the time* caused harm to OSS's reputation in any appreciable manner. As to "lost business," OSS provides no evidence of lost business or profits, but points only to a failed attempt to establish a business relationship with PolyScience, a *distributor* of equipment used in the cannabis industry, with whom Kremerman had an established relationship. *See e.g.,* Dkt. 116, Chang Exh. 15 at pp. 1-2; p. 13.

In 2016, OSS approached PolyScience to open up a distribution account to sell recirculating heaters, chillers, and immersion products. Dkt. 111, Exh. 1, Dellay Depo. Tr. 176:3-13; Dkt. 116, Chang Decl., Exh. 14. According to Joshua Delay, partnering with PolyScience

represented a substantial business opportunity for OSS and would have given OSS immediate legitimacy in the cannabis equipment industry and a cost advantage. *Id.*, Chang Decl., Exh. 17 (Dellay Depo. Tr. 176:4-178:8, 193:4-194:20, 452:453:24, 454:12-455:3). Mr. Dellay testified that such a partnership is akin to a shoe store selling Nike, Adidas, and other well-known and respected shoe brands. *Id.* at Exh. 17 (Dellay Depo. Tr. 453:4-21). He testified that other companies offer this equipment to the cannabis industry, such as Thermo, Fisher Scientific, Huber, and Julabo. Dkt. 111, Exh. 1 (Dellay Depo. Tr. 177:15-21).

In August 2016, OSS filled out a new account application form for the potential purchase of 60,000 to 100,000 chillers from PolyScience over the next six months. Dkt. 116, Chang Decl., Exh. 14 at OSS01891-98. On August 16, 2016, Steven Montgomery of PolyScience wrote to James Dellay of OSS: "James-please feel free to use this as an authorization to place a credit card order with PolyScience with a 25% Reseller discount in place." *Id.* at OSS01898. On Aug 21, 2016, (at 7:52 AM), Kremerman wrote the following email to PolyScience:

> I remember with our meeting i was adamant that i was in a suite with some crooks who stole images off my website, straw bought my hardware and sent it to China - including stealing from one of my warehouses to get my hardware without my permission, to have them duplicated. and straight up counterfeiting my products as I patent and release them. phillip struck a note as he mentioned he would avoid doing business with them at all costs once he knew who they were since he himself has been affected with the poor nature of others like that.
> phillip wrote down the open source steel, open source scientific durring our meeting and said you guys would never do business with them to build more prosperous relationship with my company.
>
> thanks
>
> im not trying to put anyone down, its just a huge conflict of interest due to the absolutely vile nature of thier business and ethics, clearly they observe the successfull nature of some of your vendors, and they peddle around trying to duplicate options and website options to attempt to stay relevant.

i am highly adamant and would have to weigh all my options, especially after our conversation relating to them, that i avoid anybody that does business with them due to ethics and principles.

And, at 12:36 AM, Kremerman wrote:

I thought you guys said you would not let polyscience sell to open source steel whom were my counterfeiters.

Dkt. 116, Chang Decl., Exh. 10 at EK04411; *see also* Exh. 18 (Kremerman Depo. Tr. 258:18-20). PolyScience responded:

Philip told the responsible parties internally to get this take care of ASAP. We do have them flagged in our system as to, "DO NOT DO BUSINESS WITH"! I expect them to be shut down immediately. Sorry for the wasted energy! Thanks for calling this to my attention, I would not have known without you telling me.

Dkt. 116, Chang Decl., Exh. 10. On August 24, 2016, PolyScience wrote to OSS on August 24, 2016, stating, "As I [sic] result of pending litigation PolyScience will be removing your account from our active account base and suspending your account by end of business day." Dkt. 116, Chang Decl., Exh. 14 at OSS01898.

OSS confirmed that while it once hoped to secure a distribution relationship with PolyScience, PolyScience was unwilling to work with OSS in light of the parties' dispute. Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 176:3-13; 178:17-21; 230:15-231:9). OSS could not identify any evidence showing that PolyScience made any decision based on false or misleading information provided by Kremerman (*id.* at 186:4-187:2; 188:8-17; 220:2-9). In addition, OSS acknowledged that it was able to secure an alternative supplier of chillers from Thermal Fisher and had not quantified whether it made more or less money distributing those chillers (*id.* at 453:25-454:10; 455:11-458:16) and admitted it had made no effort to seek to do business with PolyScience since late 2016 (*id.* at 223:18-225:5; 225:22-226:6). OSS did not

know whether it made more or less money selling Thermal Fisher's products than it would have made selling PolyScience's products (*id.* at 455:11-458:16).

In short, OSS claims it had to pay more for chillers than it believes it otherwise would have had it been able to directly deal with PolyScience. However, calculation of profits under the Lanham Act and the Washington CPA require the claimant to deduct all expenses from gross revenue to arrive at a net lost profit. *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 742 F.3d 377, 391 (9th Cir. 2014). To show lost profits, OSS would need to show that it was unable to recoup the costs of more expensive chillers through its resale margins, or that it actually made fewer sales than it otherwise would have made. It has not done so.

As previously noted, the Court has determined it will not consider the untimely declaration of Joshua Dellay (with attached exhibits) whereby OSS represents that it paid $5,764.50 more for 31 chillers than it would have paid by buying directly from PolyScience. Even if this evidence is considered, it fails to raise a question of fact as to whether OSS suffered a loss. For example, there is no indication that OSS was unable to (and did not) pass on the increased cost of the chillers to its customers or that the increased cost caused any harm to its bottom line. OSS is required to produce "actual evidence of some injury resulting from the deception." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989); *see also Appliance Recycling Centers of Am., Inc. v. JACO Envtl., Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010) ("Proof of actual injury is necessary to obtain damages under the Lanham Act").

Prior to OSS's Rule 30(b)(6) deposition, Kremerman's counsel sought to confirm that OSS had no basis for relying on any documents not previously identified in its Rule 26 disclosures or produced in discovery, but OSS's counsel did not respond. *See* Dkt. 111,

Morrissey Decl. ¶ 15 & Exh. 14. At the deposition, OSS did not identify any additional support

for its claims. Dkt. 114, Morrissey, Decl., Exh. 1 (OSS Depo. Tr. 83:10-87:9; 242:25-244:8) and

confirmed that it made business decisions to change its products and to devote its resources to

other product lines based on its perception of the "risks" posed by Kremerman's patent

infringement claims, and that those decisions resulted in its selling fewer distillation heads than it

had hoped to sell. *Id.* at 23:11-25:5; 255:7-18; 257:3-7; 257:10-258:7; 258:18-259:13; 408:15-

409:22. Thus, any loss based on those business decisions would be attributable to the pending

infringement claims rather than to the statements at issue.

In addition, OSS testified it had no track record of selling distillation heads upon which to

base projections (Dkt. 114, Morrissey Decl., Exh. 1 (OSS Depo. Tr. 246:13-22); it decided to

commit fewer development and marketing resources to selling distillation heads in 2017 (*id*. at

23:11-25:5; 255:7-18); its financial modelling did not account for new competition in the market

(*id*. at 249:6-12); its sales projections did not account for regulatory developments in the

cannabis industry (*id*. at 250:7-20); it has no written guidelines for making financial projections

(*id*. at 252:7-10), and could not explain what, if any, assumptions were made when making

projections and was unaware of any corporate record of such assumptions (*id.* at 268:18-269:9);

it had no documentation of any lost sales (*id*. at 99:12-18; 243:10-244:8); and it made the

decision to dedicate its resources to products other than distillation heads, and has actually

succeeded in selling those products and growing its business (*id*. at 257:3-258:7; 58:18-259:13).

Alternatively, OSS requests injunctive relief. Although a Lanham Act claim for

injunctive relief may be viable even in the absence of proof of damages (*see Southland Sod

Farms*, 108 F.3d at 1146), OSS did not allege a claim for injunctive relief (*see* Dkt. 97) and

raises this request for the first time at summary judgment (relying on the Court's discretionary power to grant "such other relief as necessary." Dkt. 135 at 6 n.3). More importantly, however, OSS has not produced any evidence to support such extraordinary relief. OSS's counterclaims are based entirely on statements made by Kremerman in 2016 – there is no evidence of any statements or conduct that have or are likely to occur which could possibly warrant injunctive relief after 2016. *See id*.

OSS has failed to present evidence of loss of sales, goodwill or ability to market that was caused by any statements made by Kremerman in 2016. Because this causation is a necessary element of a false marking to 35 U.S.C. § 292, the Court grants summary judgment for Kremerman on OSS's false patent marking claim.

## B.  Lanham Act

To state a claim for false advertising under § 43(a)(1)(B), a plaintiff must allege: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farms*, 108 F.3d at 1139 (citing *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir.1990)) (footnote omitted).

Courts may presume consumer deception and reliance if the defendant made an intentionally false statement regarding the defendants' product, even if the statement entailed

"little overt reference to plaintiff or plaintiff's product." *Harper House Inc.*, 889 F.2d at 209

(applying presumption to claim that product cost less than similar products and offered more

features); *see also Southland Sod Farms*, 108 F.3d at 1145 ("[T]here need not be a direct

comparison to a competitor for a statement to be actionable under the Lanham Act."). A

statement is material if it is "likely to influence the purchasing decision." *Southland Sod Farms*,

108 F.3d at 1139. Moreover, if the statements at issue are found to be literally false, the court

may presume materiality. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th

Cir. 2000). The alleged false statements at issue here fall into two categories: (1) Kremerman's

premature and false statements that he had patents and was in a lawsuit against OSS (previously

set forth in connection with OSS's false marking claim); and (2) disparaging comments about

OSS, its products, and its founders. As with the first category of statements, the "disparaging

comments" in the second category were made between March and October 2016 and were

written by Kremerman from Summit Industrial's email and posted on Summit Industrial's

webpage or were sent from his "Jon Brown [jbsholistics@ gmail.com]" email and/or posted on

his "Jonathan von Braun" Facebook page:

- "… all the shady sh*t in that shop … the unethical approach their employees also are accustomed to … i feel bad for the poor broke boys trapped within those doors by delay [sic, Dellay] balls in their mouth…." (March 22, 2016 Jonathan von Braun Facebook). Dkt. 116, Chang Decl., Exh. 5 at 69.

- "If all goes well and we finish off with OSS hopefully sooner than later…" (March 28, 2016 email to United Glass). Dkt. 116, Chang Decl., Exh. 26.

- "These are complete f*ck boys. The due dumb [sic, dumb dumb"] twins we gotta call em now." "Pile of garbage counterfeit head." "Boot the frauds. They are scammers." "hide yo keys. Oss. Only stolen sh*t." "unethical" and "liars". (April 3, 2016 Jonathan von Braun Facebook posting). Dkt. 116, Chang Decl., Ex. 5 at 47, 16, 45, 68, 69.

- "@open source steel how does it feel to be the worst company in the industry. How does it feel that every F*cking customer you rip off and lie to you comes to me for help. How does it feel to fail even at trying to copy people…. pile of garbage counterfeit head thay can't make clear….F*ck you and the china pony you rode in. If you are so bad at customer service/making a quality product/ making extracts; maybe you can send your girlfriends over – I got some pro level shit for them." (April 13, 2016 Jonathan von Braun Facebook posting). Dkt. 116, Chang Decl., Exhs. 5 at 16-20, 5a.

- "I can share our cease and desist in person…there is a reason why people try to sell our knockoffs, and another reason why we have pictures of imploded glass from competitors." (May 19, 2016 email to Tardiff, a potential customer in Maryland). Dkt. 116, Chang Decl., Exh. 7.

- "Buyer beware of counterfeit glassware….we must be the best – if they cant [sic] create they steal from summit…." (May 23, 2016 Summit Research Tech Facebook posting. Dkt. 116, Chang Decl., Exh. 16.

- "…buyers beware, this is counterfeit glass and low quality….we have images of their glass imploding on customers as well as heads in our hands that are known not to work."[8] (July 12, 2016 Summit Research Tech Facebook posting of the cease and desist letter). Dkt. 116, Chang Decl., Exh. 16.

- "[Oss] steals a lot of info from my website….We have photos of their customers with imploded flasks." (July 30, 2016 email to Crotwell, a prospective customer) Dkt. 116, Chang Decl., Exh. 8.

- "We have learned that they are using a Chinese manufacture whom glass is failing left and right….Every piece of glass I have seen reguarding [sic] heads have crooked joints, vacuum leaks from poorly tooled joings [sic], crooked glass, and thing areas that have been failing. My phone is full of pictures from these f*cking assholes and the failure they are selling and bringing to the industry."
  …

---

[8] The "imploded glass" referred to by Kremerman was identified by Ben Abrams as "Labboy glass" and the distillation head as "Spd2 from oss." Abrams explained that the OSS distillation head did not implode, but "it was the thermermoter [sic] cap that blew…and the boiling flask imploded and the cow head rexiever [sic] same time." Dkt. 116, Chang Decl., Exh. 21 at EK05502, EK05495, EK05496; Exh. 18 (Kremerman Depo. Tr. 306:19-308:5; 351:8-354:19; 351:8-34); Kremerman admitted that there was not much damage to the head (*id.*, at 354:12-19).

"Not to mention the class action suit building from other people they owe money to." *See also*, Exh. 18 (Kremerman Depo Tr. 234:14-25 ("it's an inflated comment" and stating "that was misspoken").

…

"They have ZERO MONEY in accounts, they are planning to cash out and bankrupt their company. And there were several orders that were collected by a agency due to accounts being unpaid. I can name several account they lost in the last two months including selling china glass as Chemglass….. all the American companies have dropped them." *See also*, *id.*, Exh. 18 (Kremerman Depo. Tr. 251:5-253:8)("I must have misspoke").

…

"We also have found out some dirt with investigators that they do not pay fed tax, or collect it, or give receipts. So the honest answer is they are f*cked. We filed a motion for a audit, wich [sic] if they document their sales on computer well will no matter what, if not they will get f*cked due to money being improperly handled which is a federal offence [sic]." *See also*, *id.,* Exh 18 (Kremerman Depo. Tr. 279:7-18 ("Q. So that's a false statement? A. Yeah, of course it is.")

…

"We are waiting for them to ignore his filing in federal court so either the fines build up enough to put them out of business or the delay [sic] brother will get jail time."

(August 23, 2016 email to United Glass). Dkt. 116, Chang Decl., Exh. 11.

- "Known counterfeiters on the market whom [sic] unethically steal the work of others for resale should be avoided at all costs are, Open Source, Lab Society, Hi-Trust, Julabo, Genius extraction…" (October 14, 2016, Summit Industrial Facebook posting). Dkt. 116, Chang Decl., Ex. 13.

The first issue is whether the statements are specifically attributable to Kremerman's "commercial advertising." Representations constitute commercial advertising or promotion under the Lanham Act if they are: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. *Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir.1999). Further, although the representations need not be made in a "classic advertising campaign," they must be "disseminated sufficiently to the relevant purchasing public

to constitute 'advertising' or 'promotion' within that industry." *Id*. The statements at issue fall within two general categories – those made in one-on-one email communications and those made on Facebook websites. While there are at least two email communications with prospective customers, the statements contained in those emails are not "disseminated sufficiently to the relevant purchasing public" such that they constitute "advertising" or "promotion." *See Coastal Abstract Serv.*, 173 F.3d at 735 (A handful of statements to customers does not trigger protection from the Lanham Act unless "the potential purchasers in the market are relatively limited in number" and in that case, even "a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act."). While even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act, *see*, *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996); *see also Coastal Abstract*, 173 F.3d at 735, here, OSS has provided no evidence of dissemination to the relevant purchasing public beyond the emails themselves and no evidence that the "potential purchasers in the market are relatively limited in number."

OSS has not alleged facts or provided evidence identifying the relevant group of purchasers so that the Court can weigh whether those facts raise an issue of material fact that the "potential purchasers in the market are relatively limited" or so expansive that the specific misstatements identified by OSS tend more towards "isolated" comments made in an otherwise expansive market. *See*, *e.g.*, *Oracle Am., Inc. v. Terix Computer Co., Inc.*, No. 5:13-CV-03385-PSG, 2014 WL 5847532, at *10 (N.D. Cal. Nov. 7, 2014) ("Absent some facts showing who makes up the relevant group of customers, and how Oracle widely spread its misstatements to that group, Defendants' broader allegations are not plausible.").

Statements made on websites enter interstate commerce. *See Certainteed Corp. v. Seattle Roof Brokers*, 2010 WL 2640083, *5 (W.D. Wash.) ("The internet, by its nature, is accessible by an interstate audience."); *see also*, *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("the Internet is both an instrumentality and channel of interstate commerce"). While the statements made on Kremerman's internet websites arguably reached a wider audience (and several are false on their face as evidenced by Kremerman's testimony that he "misspoke," "overstated," or "inflated"), the question remains as to whether they constitute commercial speech. Again, while they need not be part of a "classic advertising campaign," the statements "must be disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry." *Coastal*, 173 F.3d at 735. Here, there is no evidence that Kremerman made false statements via widespread advertisements. There is also no evidence of the relevant market, *i.e.,* who the customers or potential customers are, who received and read the statements, and whether the customers relied on those statements in making purchasing decisions. And most importantly, there is no evidence that OSS has or will suffer any injury from the false statements.

While a claim for damages for false advertising under the Lanham Act does not require "empirical quantification or expert testimony," *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012), it does require, as an essential element "actual evidence of some injury resulting from the deception...." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989). OSS presented no evidence of injury causally related to Kremerman's deception. There is no evidence of lost profits and no evidence that consumers were deceived. OSS contends however, that it is suffering actual monetary and competitive injury from Kremerman's

unfair business practices because Kremerman's actions torpedoed OSS's chance of a relationship with PolyScience, which would "have enhanced OSS's reputation and credibility, given OSS a cost advantage, and provided other opportunities." Dkt. 135 at 7 (internal citations omitted). As previously noted, OSS has failed to show that it was unable to recoup the costs of the more expensive chillers through its resale margins or that it actually made fewer sales than it otherwise would have made.

OSS also contends that it need not prove monetary damages under the Lanham Act when seeking an injunction, but as discussed above, OSS is not entitled to injunctive relief as it has neither sued for such relief nor provided evidence warranting such relief.

## C. Unfair Business Practices – RCW Section 19.86

Under Washington law, a plaintiff bears the burden to prove the following elements to establish a violation of the Consumer Protection Act ("CPA"): (1) an unfair or deceptive practice; (2) occurring in trade or commerce; (3) affecting the public interest; (4) that injures the plaintiff in his or her business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 719 P.2d 531 (1986). The CPA is analogous to the Lanham Act, so that when a party is found liable under the Lanham Act, it is also liable under the CPA. *See Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 905 F.Supp.2d 1235, 1251 at fn. 8 (W.D. Wash. 2012), *citing Campagnolo S.r.l. v. Full Speed Ahead, Inc.*, 2010 WL 1903431 at *11 (W.D. Wash. May 11, 2010).

Because OSS has not shown any facts demonstrating that it was injured or will likely be injured as a result of Kremerman's unfair practices, summary judgment is granted for Kremerman on OSS's Washington CPA claim.

Accordingly, it is hereby **ORDERED** that:

(1)  Kremerman's motion for summary judgment (Dkt. 113) is **GRANTED**;

(2)  OSS's motion for summary judgment (Dkt. 115) is **DENIED**; and OSS's counterclaims are **dismissed with prejudice**.

(3)  Because Kremerman has withdrawn his affirmative claims, and the Court grants Kremerman's motion to dismiss OSS's counterclaims with prejudice, the Clerk of Court shall enter judgment dismissing OSS's counterclaims with prejudice, and shall close this case.

DATED this 5th day of November, 2018.



BRIAN A. TSUCHIDA
Chief United States Magistrate Judge